UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ASSASSINATION ARCHIVES AND          :
RESEARCH CENTER                     :
                                    :
          Plaintiff,                :
                                    :
     v.                             : Civil Action No. 17- 00160 (TNM)
                                    :
CENTRAL INTELLIGENCE AGENCY,        :
                                    :
                                    :
          Defendant.                :
_____   :


**AARC'S CROSS-MOTION FOR SUMMARY JUDGMENT
TO REQUIRE CIA TO PERFORM AN ADEQUATE SEARCH
AND RELEASE NON-EXEMPT RECORDS, OR PORTIONS**

# **TABLE OF CONTENTS**

**Page #**

BACKGROUND…………………………………………………… 5

ARGUMENT

    I. LEGAL STANDARDS GOVERNING SUMMARY
    JUDGMENT AND VAUGHN INDICES AND
    VAUGHN DECLARATIONS………………………………….. 12

    II. CIA HAS FAILED TO ADEQUATELY SEARCH FOR,
    LOCATE, RETRIEVE AND PRODUCE RESPONSIVE
    RECORDS……………………………………………………… 15

    III. CIA's VAUGHN INDEX IS WHOLLY DEFICIENT………….. 24

    IV. CIA's b(1) EXEMPTION CLAIM IS UNSUPPORTED………… 26

    V. CIA's EXEMPTION 3 CLAIMS FAIL…………………………. 28

    VI. CIA's EXEMPTION 5 CLAIM FAILS………………………… 30

    VII. CIA's EXEMPTION 6 CLAIM FAILS………………………… 31

    VIII. CIA'S POSITION THAT THERE IS ONLY ONE
    DOCUMENT RELATING TO PLOTS AGAINST HITLER IS
    ILLOGICAL AND CONTRARY TO HISTORY……………………. 33

CONCLUSION…………………………………………………….. 34

# TABLE OF AUTHORITIES

*Federal Cases*

*Baker* v. *CIA*,
  580 F.2d 664, 669 (D.C.Cir. 1978)…………………………………….28
*\*Dept. of Air Force* v. *Rose*,
  425 U.S. 352 (1976)……………………………………………………12
*EPA* v. *Mink*,
  410 U.S. 73 (1973)……………………………………………………….31
*\*Founding Church of Scientology, Inc.* v. *Nat. Sec. Agency*,
  610 F.2d 824, 836-37 (D.C.Cir.1979)………………………………….16,17
*Hall* v. *C.I.A.*,
  668 F.Supp.2d 172 (D.D.C. 2009)……………………………………….12
*\*King* v. *United States Department of Justice*,
   830 F.2d 210, 218 (D .C .Cir .1987)………………………………..13,14,15,24
*Meeropol* v. *Meese*,
  790 F.2d 942 (D.C.Cir.1986)……………………………………………16,17
*Military Audit Project* v. *Casey*,
  656 F.2d 724 (D.C.Cir.1981)……………………………………………. 13
*Milner* v. *Dept. of Navy*,
  562 U.S. 562 (2011)…………………………………………………….. 12
*Morley* v. *CIA*,
   508 F. 3d 1108, 1117 (D.C.Cir. 2007)……………………………… 20,21
*Morley* v. *Central Intelligence Agency (2016 Morley)*,
  810 F.3d 841 (D.C.Cir. 2016)………………………………………… 32
*MultiAg Media LLC* v. *Dept. of Agriculture*,
  515 F.3d 1224 (D.C.Cir.2008)………………………………………… 12
*National Cable Television Ass'n* v. *FCC*,
  479 F.2d 183 (D.C. Cir.1973)………………………………………… 16
*Neugent* v. *U.S. Dept. of Interior*,
  640 F.2d 386(D.C. Cir. 1981)………………………………………… 20
*Phillippi* v. *CIA* ,
  546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976)…………………………… 28
*Sack* v. *CIA*,
  49 F. Supp. 3d 15 (D.D.C. 2014)……………………………………….29

*Truitt* v. *Department of State*,
  897 F.2d 540 (D.C.Cir. 1990)………………………………………… 17
*\*Vaughn* v. *Rosen*,
  484 F.2d 820, (D.C.Cir. 1973)……………………………………………13,24
*Weisberg* v. *United States Dept. of Justice*,
  627 F.2d 365 (D.C.Cir.1980)………………………………………… 16,17
 *Weisberg* v. *Department of Justice (1984 Weisberg)*,
   745 F.2d 1476, 1485 (D.C.Cir.1984)…………………………………….. 16

### Rules and Statutes

*Central Intelligence Agency Act of 1949*
  50 U.S.C. §3507………………………………………………………….. 28
*CIA Information Act of 1984,*
   50 U.S.C. Sec. 3141(c), previously codified as Section 431(c)……… 20,22
*Federal Rule of Civil Procedure.* 56(c)…………………………………..  12
*\*Freedom of Information Act (FOIA)*
  5 U.S.C. Sec. 552………………………………………………………*passim*
*National Security Act of 1947,*
  50 U.S.C. §3024……………………………………………………………29
*President John F. Kennedy Assassination Records Collection Act*
  *of 1992(“JFK Records Act”)*, 44 U.S.C. Section 2107 notes……….. 5-6,23,32

### Miscellaneous

*\*Executive Order 13,526*………………………………………………… 26,27,30

Plaintiff Assassination Archives and Research Center ("AARC") hereby opposes Central Intelligence Agency's ("CIA's") Motion for Summary Judgment and cross-moves for summary judgment against the CIA for an order requiring an adequate search for responsive records and to release nonexempt records or portions thereof to plaintiff and the public.

## BACKGROUND

Plaintiff AARC is a non-profit and non-governmental organization incorporated in 1984.  AARC's mission is to collect, preserve and make available to the public research materials relating to political assassinations and related subjects; conduct research and seminars in the field of political assassinations, and publish and disseminate scientific and public information concerning political assassinations and related subjects.  As part of its research and public information functions, AARC uses government records made available to it under the FOIA. AARC's archive contains the largest collection of materials on the assassination of President John F. Kennedy in private hands.

AARC's amended Freedom of Information Act ("FOIA") request at issue seeks information related to a Joint Chiefs of Staff memorandum ("JCS Memo" or "Higgins Memorandum") of a meeting dated September 25, 1963 obtained by AARC pursuant to the *President John F. Kennedy Records Collection Act of 1992*

*("JFK Records Act")*, 44 U.S.C. Section 2107 notes.  Paragraph 13 of the JCS Memo records a briefing given to the Chiefs by the head of CIA Cuban operations, Desmond FitzGerald ("FitzGerald") (ECF#1-1, page 7).   Mr. FitzGerald tells the Chiefs that to develop a plan for overthrowing Fidel Castro, CIA is studying in detail a parallel in history, the plot to assassinate Adolf Hitler during World War II.[1]  AARC is not aware of other records released under the JFK Records Act related to this subject matter, and seeks such records from CIA.

According to findings of the Senate Select Committee on Government Operations with Respect to Intelligence Activities (**"the Church Committee"**) and a CIA Inspector General report, Desmond FitzGerald travelled to Paris, France in late October 1963 to meet with a Cuban Army officer**,** a CIA asset known as AMLASH**,** to organize an assassination and overthrow attempt against Fidel Castro.  *The Church Committee Report***,** at pages 86-90**,** further discussed below, ECF #8-3.  At the moment President Kennedy was assassinated in Dallas, Texas on November 22, 1963 a CIA operative was meeting again with AMLASH in Paris and providing him with an assassination weapon to use against Fidel Castro.  *Id.*

---

[1] The plot to assassinate Hitler was attempted unsuccessfully on July 20, 1944, and is known as the "July 20 plot" or "Valkyrie plot".  Valkyrie was the codename for a Nazi Germany secret plan to suppress internal rebellion by foreign workers.  The July 20 plot planners attempted to use the Valkyrie operation to overthrow Hitler's regime, however Hitler was only slightly wounded and quickly reasserted his authority.  Dulles, Allen Welsh, *Germany's Underground*, Da Capo Press (2000), p. 1.  Casey, William, *The Secret War Against Hitler*, The Berkley Publishing Group, (1989), p. 138.  Allen Dulles was a Director of the CIA and a member of the Warren Commission that investigated President Kennedy's assassination.

Specifically, plaintiff AARC's FOIA request, as amended, dated October 19,

2012 (ECF #1-2) asks for the following records or information:

      1. All records pertaining to any plot to assassinate Adolf Hitler,
including, but not limited to, all records in any way reflecting or referencing the
CIA's study in 1963 of plots to assassinate Hitler. As I did with my original
request, I attach a copy of the September 25, 1963 Memorandum for the Record of
Walter M. Higgins, Jr. of the Joint Chief re: "Briefing of Desmond Fitzgerald on
CIA Cuban Operations and Planning."

      2. All records on or pertaining to communications by or with Allen
Dulles regarding plots to assassinate Adol(f) Hitler during Dulles's service in the
Office of Policy Coordination (OPC), the Office of Strategic Services (OSS), and
the Central Intelligence Agency (CIA).

      3. All index entries or other records reflecting the search for records
responsive to this request in its original or amended form, including all search
times  used with each of the components searched.

      These records are relevant to various official investigations, including
those of the  President's Commission on the Assassination of President John F.
Kennedy (The Warren Commission), the Senate Select Committee on
Government Operations with Respect to Intelligence Activities (The Church
Committee)**,** and the House Select Committee On Assassinations (**"The HSCA"**).
As such, the immunity from search and review for  operational files does not apply
to these records. Please conduct a full search of operations files for all records
pertaining to this request.

AARC received no determination on its amended request until it received the

CIA's letter dated June 5, 2015 which informed AARC that a search revealed no

records responsive to AARC's request.  (CIA June 5, 2015 letter attached to

Complaint as Exhibit 6 [ECF #1-6, page 1]).

However, by letter dated November 2, 2015 CIA reversed itself and notified

AARC, "(p)lease be advised that our letter of 5 June 2015 was sent to you in error.

Your request is still under review. We apologize for any inconvenience." (Exhibit 6 to Complaint [ECF #1-6, page 2].)

By letter dated April 29, 2016 CIA reversed itself again and notified AARC that the June 5, 2015 letter remained unchanged and that CIA located no records responsive to AARC's request. (Exhibit 6 to Complaint [ECF #1-6, page 3]).  As of the filing of this complaint, plaintiff had received no records responsive to its FOIA request. After filing its complaint and making a motion for partial summary judgment on the adequacy of the CIA's search, on August 18, 2017 CIA released six responsive records to AARC, with redactions.  Release attached hereto as Exhibit 1.  The release consisted of a 69 page document titled *Propagandists' Guide to Communist Dissensions* and five heavily redacted records related to CIA's search.

The *Propagandists' Guide* document contains a section related to consideration of the then-oncoming 20th anniversary of the plot to kill Hitler, pp. 35-38 of Exhibit 1.  The July 20 plot to assassinate Hitler was attempted on July 20, 1944, and the approaching anniversary was July 20, 1964.  There are no released documents or portions related to CIA's documented detailed study in Fall 1963 of the plot to kill Hitler to develop an approach to dealing with Fidel Castro in Cuba. Most of one page related to the July 20 is redacted under claims of Exemptions 1 and 3.  CIA's study in detail of the Hitler plot in Fall 1963 remains of extremely

high public interest in light of the assassination of President Kennedy later in November 1963.  Multiple government investigations of President Kennedy's assassination have considered whether U.S. government efforts made to overthrow Fidel Castro may have caused the President's assassination.

AARC attaches the declaration of journalist and author William E. Kelly, Jr. ("Kelly") who has long studied ties between the evidence in the Kennedy assassination and the July 20 plot.  Exhibit 2.  In 1995 Mr. Kelly conducted a telephone interview with Volkmar Schmidt ("Schmidt"), a German living in Dallas in 1963 as an employee of an oil company.  He is now deceased.  Mr. Schmidt appears in the Warren Commission Report, chaired by Chief Justice Earl Warren. The Warren Report states that Volkmar Schmidt attended a party for the Oswalds in Dallas in February 1963.  Page 722, *The Warren Commission Report*, St. Martin's Press, New York.

Author William E. Kelly, Jr. states in his declaration that he interviewed Volkmar Schmidt by telephone in 1995 about Schmidt's meeting the Oswalds in February 1963.  Schmidt told Kelly that he had engaged Lee Harvey Oswald in a two hour conversation that evening, in which Schmidt employed a reverse psychology technique he had learned from his surrogate father, Dr. Whilhelm Keutemeyer ("Keutemeyer") of University of Heidelberg in Germany.  Schmidt told Kelly that in the course of this long conversation he had brought up the July

20 plot to Oswald, and had suggested to Oswald that right-wing US retired General Edwin Walker ("Walker"), then living in Dallas, should be assassinated as Hitler should have been in 1944.  Schmidt told Kelly that Dr. Keutemeyer, who had raised him, was an associate of two of the figures in the July 20 plot who had been executed for their participation in that plot. Kelly decl., Exh. 2, pp.1-2.

Shortly after Oswald's meeting with Volkmar Schmidt, Oswald allegedly purchased a mail order rifle, which authorities contend was used in a shooting attack by Oswald on General Walker in April 1963, and in the assassination of President Kennedy on November 22, 1963.  Author Kelly details in his declaration other connections between the July 20 plot and the assassination of President Kennedy.  For example, Marina Oswald was living with Ruth Paine in November 1963 and Lee Harvey Oswald in fact spent the night before the assassination with his wife at Ruth Paine's home, and allegedly obtained his rifle from the Paine garage.

Ruth Paine's mother-in-law was Ruth Forbes Paine Young ("Young"), who was a close personal friend and travelling companion of Mary Ellen Bancroft ("Bancroft").  Bancroft worked in World War II with Allen Dulles ("Dulles") in Switzerland, where he was the Chief agent in charge of Switzerland and Germany for the Office of Strategic Services. (OSS), the US spy agency.  Dulles and Bancroft worked closely with German military intelligence figure Hans Bernd

Gisevius ("Gisevius"),  who was their link to the July 20 plotters. Kelly decl. para.

13-14.   Dulles and Bancroft assisted Gisevius in his successful escape from

Germany after the failed attempt on Hitler's life on July 20, 1944.  Allen Dulles

later served as Director of the CIA from 1953-61, and was a member of the Warren

Commission that investigated the assassination of President Kennedy.

   CIA's study of the Hitler plot in Fall 1963 is a newly discovered effort to

overthrow Castro close in time to President Kennedy's assassination and therefore

a new and previously unexplored area of investigation in the assassination of

President Kennedy.  On October 26, 2017 President Donald J. Trump issued this

official statement instructing release of records related to the assassination of

President Kennedy:

   Today, President Donald J. Trump took action to ensure release of the
   remaining President John F. Kennedy Assassination Records. Accordingly, the
   National Archives and Records Administration will make approximately 2,800
   records available in full for public access today. The remaining records will be
   released with agency-proposed redactions on a rolling basis in the coming weeks.
   The President has demanded unprecedented transparency from the agencies and
   **directed them to minimize redactions without delay.** The National Archives
   will therefore release more records, **with redactions only in the rarest of
   circumstances,** by the deadline of April 26, 2018. (**emphasis added**). The White
   House Office of the Press Secretary, For Immediate Release, October 26, 2017.

## ARGUMENT

## I.  LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT AND VAUGHN INDICES AND VAUGHN DECLARATIONS

### A. Summary Judgment Standard

The FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for categories of material." *Milner* v. *Dept. of Navy (Milner)*, 562 U.S. 562, 565 (2011). Ultimately, "disclosure, not secrecy, is the dominant objective of the act." *Dept. of Air Force* v. *Rose*, 425 U.S. 352,361 (1976). "For this reason, the 'exemptions are explicitly made exclusive... and must be 'narrowly construed.'" *Milner* at 565 (citations omitted).

Agency actions under the FOIA are subject to *de novo* review. 5 U.S.C. § 552(a)(4)(B). "This requires the court to 'ascertain whether the agency has sustained its burden of demonstrating that the documents requested ... are exempt from disclosure under the FOIA."'' *MultiAg Media LLC* v. *Dept. of Agriculture*, 515 F.3d 1224, 1227 (D.C.Cir.2008)(citations omitted).

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Hall* v. *C.I.A.*, 668 F.Supp.2d 172, 178 (D.D.C. 2009), citing *Fed.R.Civ.P.* 56(c). A District Court may award summary judgment "solely on the information provided in affidavits or declarations that describe 'the justifications

for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Id.*, quoting *Military Audit Project* v. *Casey*, 656 F.2d 724,738 (D.C.Cir.1981).

### B. *Vaughn* Index Standard

As noted in *King* v. *United States Department of Justice (King)*, 830 F.2d 210, 218 (D .C .Cir .1987) "[t]he significance of agency affidavits in a FOIA case cannot be underestimated." The reason for this is that ordinarily the agency alone possesses knowledge of the precise content of documents withheld. Thus, "the FOIA requester and the court both must rely upon its representations for an understanding of the material sought to be protected." *Id* .The agency's statements are critical because "'[t]his lack of knowledge by the party see[k]ing disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution,' with the result that '[a]n appellate court, like the trial court, is completely without the controverting illumination that would ordinarily accompany a lower court's factual determination.'" *Id.*, quoting *Vaughn* v. *Rosen*, 484 F.2d 820, 824-825 (D.C.Cir. 1973).

As *King* also stated:  Specificity is the defining requirement of the *Vaughn* index and affidavit; affidavits cannot support summary judgment if they are "conclusory, merely reciting statutory standards or sweeping." To accept an

inadequately supported exemption claim "would constitute an abandonment of the trial court's obligation under the FOIA to conduct a de novo review." *King,* 830 F.2d at 219 (citations omitted).

This index "must describe each document or portion thereof withheld, and for each withholding it must discuss the consequences of disclosing the sought after information." *Id*, at 223-224 (emphasis in original). "Furthermore, a reproduction of the redacted documents can only show the court the context from which an item has been deleted, and context may or may not assist the court in assessing the character of the excised material and the grounds for its deletion." *Id*. at221. Footnote 90 to this passage sets forth examples of the kinds of information that may need to be considered in making a determination as to whether an agency has carried its burden to show that information is substantively classified:  Contextual information cannot, for instance, answer questions of the following order. Is an intelligence source whose name has been excised still alive? Has that source been otherwise identified in the decades since the report was filed? Would information deleted on the theory that it might identify a source still do so fifty years after the fact? Is a particular intelligence method or activity still in use? If not, what concerns warrant continuing protection for information on intelligence methods and activities from the 1960's?

*King* also made clear that courts must be wary of the categorization of

exemption claims. It laid down specific instructions for evaluating such claims:
Categorical description of redacted material coupled with categorical indication of
anticipated consequences of disclosure is clearly inadequate. To support its
Exemption 1 claims the agency affidavits must for each redacted document or
portion thereof, identify the document, by type and location in the body of
documents requested; (2) note that Exemption 1 is claimed; (3) describe the
document withheld or any redacted portion thereof, disclosing as much information
as possible without thwarting the exemption's purpose; explain how this
information falls within one or more of the categories of information authorized by
the governing executive order, and (5) explain how disclosure of the material in
question would cause the requisite degree of security to the national security.
*Id.* at 224 (footnote omitted).

As will be argued below, defendant fails to meet its burden under the
standards set forth in *King*.

## II. CIA HAS FAILED TO ADEQUATELY SEARCH FOR, LOCATE, RETRIEVE AND PRODUCE RESPONSIVE RECORDS.

### A. Legal Standard Governing Searches

To prevail in a FOIA case, "the defending agency must prove that each
document that falls within the class requested either has been produced, is
unidentifiable or is wholly exempt from the Act's inspection requirements."

*National Cable Television Ass'n.* v. *FCC (NCTA)*, 479 F.2d 183, 186 (D.C.

Cir.1973).  Agency affidavits regarding the search for responsive records are

inadequate to support summary judgment where they "do not note which files were

searched or by whom, do not reflect any systematic document location, and do not

provide information specific enough to enable [the plaintiff] to challenge the

procedures utilized."  *Weisberg* v. *United States Dept. of Justice (Weisberg)*, 627

F.2d 365, 371 (D.C.Cir.1980).

When the adequacy of the agency's search is in dispute, summary judgment

for an agency is inappropriate as to that issue.  *See Founding Church of*

*Scientology, Inc.* v. *Nat. Sec. Agency (Founding Church)*, 610 F.2d 824, 836-37

(D.C.Cir.1979)("To accept its claim of inability to retrieve the requested

documents in the circumstances presented is to raise the specter of easy

circumvention of the [FOIA] . . . and if, in the face of well-defined requests and

positive indications of overlooked materials, an agency can so easily avoid

adversary scrutiny of its search techniques, the Act will inevitably become

nugatory.").

It is a truism that the issue is not whether the documents might exist that are

responsive to the request, but rather whether the search conducted by the agency

was "<u>adequate</u>."  *Weisberg* v. *Department of Justice*, 745 F.2d 1476, 1485

(D.C.Cir.1984)*(1984 Weisberg)*((emphasis in the original); *Meeropol* v. *Meese*,

790 F.2d 942, 956 (D.C.Cir.1986)*(Meeropol)*("[a] search need not be perfect, only

adequate, and adequacy is measured by the reasonableness of the effort in light of

the specific request.")  In *Truitt* v. *Department of State*, 897 F.2d 540 (D.C.Cir.

1990)*(Truitt)*, the Court of Appeals elaborated on this standard, stating that:

> It is elementary that an agency responding to a FOIA request must
> conduct a search reasonably calculated to uncover all relevant documents,' and, if
> challenged, must demonstrate `beyond a material doubt' that the search was
> reasonable.  "'The issue is not whether any further documents might conceivably
> exist but rather whether the government's search for responsive documents was
> adequate.'  The adequacy of an agency's search is measured by a standard of
> reasonableness,' and is dependent upon the circumstances of the case." Id. at 642
> (footnotes omitted)(emphasis added).

If such doubt exists as to the adequacy of the search, *Truitt* counsels, "summary

judgment for the agency is not proper."   Id. (footnote omitted).   Where the

sufficiency of the agency's identification or retrieval procedure is genuinely in

issue, summary judgment is not in order[,] *Founding Church, supra*, 610 F.2d at

836, and the plaintiff is entitled to take discovery on the adequacy of the search.

*Weisberg, supra*, 627 F.2d at 371.

Here, the CIA has not demonstrated that the search that it conducted was

reasonable.  Accordingly, this Court should order the CIA to conduct further

searches and AARC should be allowed to pursue discovery on the CIA's search

efforts.  As AARC shows below, it is clear that the CIA has failed to conduct an

adequate search.  Indeed, a plethora of evidence indicates that the CIA has failed to

meet its obligation to search for, locate, retrieve and produce responsive records.

B.  The Inadequacy of the CIA's Search Is Evidenced by the Absence of
Records Pertaining to Known Operations, Events and Activities

The CIA claims to have been unable to locate any records responsive to

AARC's request.  This claim does not square with the available evidence.  The

September 25, 1963 Higgins Memorandum of the Joint Chiefs meeting clearly

states in paragraph 13 that CIA was studying in detail the 1944 plot to assassinate

Adolf Hitler to develop an approach to overthrowing Fidel Castro (ECF# 1-1, page

7).  It follows that there would be records or information related to this detailed

study of the plot.  The fact that it is a detailed study supports the conclusion that

records or information would be created about this matter, and supports the

conclusion that considerable material would be memorialized in records.

In addition, after the assassination of President Kennedy on November 22, 1963

the U.S. government launched an official investigation of the assassination, by the

Warren Commission.  Records related to the CIA's study of the Hitler plot to

develop a plan to overthrow Fidel Castro would have been relevant to this official

investigation and preserved for that purpose.

It is simply not credible that no records or information were created about a

highly important CIA mission to study the Hitler plot to develop an approach to

overthrow and/or assassinate Fidel Castro.  In fact, the Higgins memo shows that

the Joint Chiefs of Staff did create, maintain and preserve records related to this

activity, and the logical conclusion is that the CIA did as well, and that they remain

unsearched, or at least unlocated and unretrieved.  CIA Cuba task force head

Desmond FitzGerald would have created a memorandum of his briefing of the

Joint Chiefs, yet such a document remains unsearched for and unproduced.

Author Kelly's declaration (Exhibit 2) details connections between the Kennedy

assassination and the July 20 plot, further adding to the importance of an adequate

search for responsive materials.  And as noted, on October 26, 2017 President

Trump ordered that all records related to the Kennedy assassination be released as

soon as possible with minimal redactions.

C. CIA's conflicting statements as to whether it has responsive records
    support the conclusion that such records exist and require discovery
    by plaintiff.

CIA's first substantive response to AARC's amended request came in a letter

dated June 5, 2015 that stated, "We did not locate any records responsive to your

request."  ECF #1-6, page 1.  On November 2, 2015 CIA rescinded their earlier

letter with a letter stating, "Please be advised that our letter to you of 5 June 2015

was sent to you in error.  Your request is still under review.  We apologize for any

inconvenience."  ECF#1-6, page 2.

CIA reversed course again in a letter dated 29 April 2016, which stated, "Our

previous 5 June 2015 response to your request remains unchanged…"  ECF#1-6,

page 3.

CIA's multiple reversals and self-admitted errors in conducting this search and reporting it to AARC raise very troubling questions as to the conduct of the search. Most telling, CIA's declarations submitted in this case do not attempt to explain or even address the handling of AARC's request and its multiple errors and reversals.

In addition to ordering a new and competent search, this Court should allow AARC to conduct discovery on CIA's handling of this search in the form of a deposition or depositions of the officials who conducted the searches and are responsible for the contradictory responses. *Neugent* v. *U.S. Dept. of Interior* (*Neugent*), 640 F.2d 386,391 (D.C. Cir. 1981) holding that discovery sought prior to summary judgment should be answered in the interests of clarifying the matter.

D. <u>CIA must be ordered to further search its operational files for responsive records.</u>

The subject matters of AARC's request, plots to overthrow and/or assassinate Fidel Castro and the assassination of President Kennedy, are not covered by the exemption from search of operational files under FOIA in the *CIA Information Act of 1984* (50 USC Sec. 3141(c), previously codified as Section 431(c)). The D.C. Circuit has held in the *Morley* case that the exemption from search does not apply to matters investigated by the Church Committee and that the scope of the Church Committee investigation specifically encompassed operations of the CIA and other federal agencies in investigating the assassination of President Kennedy. *See*

*Church Committee, The Investigation of the Assassination of President John F.*

*Kennedy: Performance of the Intelligence Agencies, S.Rep. No. 94-755, Book V*, at

1 (1976), portions attached hereto as Exhibit 1;  *Morley* v. *CIA*, 508 F. 3d 1108,

1117 (D.C.Cir. 2007).  CIA concedes in its motion papers that its operational files

should be searched for records responsive to AARC's request.  The scope of the

various investigations of assassination plots give guidance to what CIA must

search to respond to AARC's request.

   The scope of the Church Committee's investigation also included plots to

overthrow and/or assassinate Fidel Castro in 1963, including the plot involving

AMLASH**,** in which Desmond Fitzgerald was personally involved**,** and a related

program to foster dissension in the Cuban military and possibly provoke a coup.

"Alleged Assassination Plots Involving Foreign Leaders", *Interim Report of the*

*Select Committee to Study Governmental Operations with respect to Intelligence*

*Activities, United States Senate ("Church Committee"), 94th Congress, Report No.*

*94-465, November 20, 1975*, page 86 and fn. 2, ECF #8-3.  CIA must search these

records.

   Adding weight to the public interests involved, CIA plots to assassinate Fidel

Castro were the subject of an investigation by the Inspector General ("IG") of the

CIA ordered by President Johnson in 1967.  *CIA IG Report on Plots to Assassinate*

*Fidel Castro dated May 23 1967* ECF #8-4. This IG investigation specifically

investigated the activities of Desmond FitzGerald in 1963 that are subject of

AARC's FOIA request, including FitzGerald's CIA activities in September,

October and November 1963.  CIA IG Report pp. 75-111. Fitzgerald's activities in

relation to the AMLASH project were also the specific subject of the IG

investigation.  *Ibid.* pp. 78-111.  Such Inspector General investigations are also

exceptions from the FOIA search exemption of 50 U.S.C. Sec. 3141(c)**.**  As CIA

concedes, the language of the statute requires that FOIA searches must be

conducted for such records or information.  CIA must search these records.

Further, the assassination of President Kennedy was the subject of an

investigation by the Department of Justice and a Presidential Commission, the

Warren Commission.  Former CIA Director Richard Helms has publicly stated that

CIA initiated an investigation of the assassination of President Kennedy that began

with an effort to find out if CIA operatives were in Dallas at the time of the

assassination.  https://www.youtube.com/watch?v=e3nDUEgh05o  .  These records

have never been produced to AARC's knowledge and CIA must search them in

response to AARC's request.

Government investigative agencies, and in particular the CIA, did not inform

the Warren Commission about plots to kill Fidel Castro undertaken or developed

by U.S. government agencies.  *Foreword by former President Gerald R. Ford*

(member of the Warren Commission), "A Presidential Legacy and The Warren

Commission", FlatSigned Press, Nashville, TN, 2007, p. XXII, ECF #8-5.  Allen

Dulles served on the Warren Commission and was knowledgeable of plots to

assassinate Castro from his tenure as CIA Director, yet he did not inform his fellow

Commissioners of these plots.  This misconduct adds weight to the public interests

at issue here, and CIA must search its records of plots to assassinate Fidel Castro.

The House of Representative Select Committee on Assassinations ("HSCA")

investigated all of these issues as part of its investigation of the assassination of

President Kennedy.  The Congress of the United States unanimously passed a law

in 1992, enacted by the President, requiring the expeditious release to the public of

all government records related to the assassination of President Kennedy and

investigations of the assassination.  *President John F. Kennedy Records Collection*

*Act of 1992 (JFK Records Act or JFK Act)*, codified at 44 U.S.C. Sec. 2107 notes.

And, as noted, President Trump on October 26, 2017 ordered that all records

related to the assassination of President Kennedy be released forthwith with

minimal redactions.  These official acts add even more weight to the public

interests at issue, and CIA must search its records related to these actions.

E.  CIA must be ordered to search under search terms not yet utilized.

CIA's declarations do not state that CIA has searched for responsive records

under search terms that would reasonably produce responsive records.  CIA has not

searched under "plot to kill Hitler" even though that is the frequently used phrase.

Nor has CIA searched under "July 20 plot" or "Valkyrie plot", even though these are the most commonly used terms for the 1944 plot to assassinate Hitler.  Nor has it searched under such terms as "Joint Chiefs meeting September 25, 1963", Rolando Cubela, or "Castro overthrow" or Manuel Artime, Desmond Fitzgerald, or Walter Higgins.

### III. CIA's VAUGHN INDEX IS WHOLLY DEFICIENT.

As noted above, in *King*, 830 F.2d 210, 218, "[t]he significance of agency affidavits in a FOIA case cannot be underestimated." The reason for this is that ordinarily the agency alone possesses knowledge of the precise content of documents withheld. Thus, "the FOIA requester and the court both must rely upon its representations for an understanding of the material sought to be protected." *Id* .The agency's statements are critical because "'[t]his lack of knowledge by the party see[k]ing disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution, 'with the result that '[a]n appellate court, like the trial court, is completely without the controverting illumination that would ordinarily accompany a lower court's factual determination.'" . *Id*., quoting *Vaughn* v. *Rosen*, 484 F.2d 820, 824-825 (D.C.Cir. 1973).

As *King* also stated:  Specificity is the defining requirement of the *Vaughn* index and affidavit;  affidavits cannot support summary judgment if they are "conclusory, merely reciting statutory standards or sweeping." To accept an

inadequately supported exemption claim "would constitute an abandonment of the trial court's obligation under the FOIA to conduct a de novo review." *Id*., at 219 (citations omitted).  This index "must describe each document or portion thereof withheld, and  for each withholding it must discuss the consequences of disclosing the sought  after information." *Id*, at 223-224 (emphasis in original).

In this case, the *Vaughn* index submitted by CIA is wholly deficient.  It fails to specifically link asserted FOIA exemptions to rationales for withholding, and instead makes blanket assertions for multiple FOIA exemptions.  Since FOIA exemptions were enacted to meet specific factual situations, this blanket assertion of rationales for exemptions is inappropriate and does not justify the withholdings.

Further there is no context given for the Court or counsel to understand the asserted exemptions.  Documents are released related to Propaganda techniques, yet CIA seems to claim an exemption for these same Propaganda techniques, which is illogical and inappropriate.

CIA's b(5) claims are asserted as deliberative process, yet the material withheld appears to be factual material that is not covered by the deliberative process privilege, and rather is most relevant to the Court's understanding of what material was searched and what material was found in the search.  CIA's presentation appears to be that a number of searches were undertaken in various components and responsive material was found, but a decision was then made to not report this

material to requester.  These are factual questions related to the results of the

search that the Court and counsel need to know.

### IV. CIA's b(1) EXEMPTION CLAIM IS UNSUPPORTED.

CIA claims a b(1) national security exemption for material that is in excess of

50 years old, despite the provisions of Executive Order 13,526 that mandate

automatic declassification for material over 50 years in age.  CIA attempts

unsuccessfully to maintain an exception to the automatic declassification at 50

years provision.  CIA's argument for the exception fails to address the language of

the executive order that is contrary to CIA's position.  *EO 13526, Section 3.3(h)*

states:

(1) Records that contain information the release of which should clearly and

   demonstrably be expected to reveal the following are exempt from automatic

   declassification at 50 years:

   (A) the identity of a confidential human source or a human intelligence source;

   or

   (B) key design concepts of weapons of mass destruction.

(2) In extraordinary cases, agency heads may, within 5 years of the onset of

   automatic declassification, propose to exempt additional specific information

   from declassification at 50 years.

In this case CIA asserts that the records are not human source or human intelligence records, nor are they related to weapons of mass destruction, so the provision of EO 13526 that CIA relies on is Section 3.3(h)(2) above.  This section applies only to extraordinary cases in which within five years of automatic declassification an agency head may propose to exempt additional specific information.

CIA's submission in this case does not contend that this is an extraordinary case, nor that the specific information withheld was proposed by an agency head for exception to automatic declassification.  This record is bare of any CIA claim that this specific information was proposed for exemption prior to the 50 year automatic provision, and the CIA assertion must be rejected.

The *Propagandist's Guide* document does not contain classification markings that comply with the requirements of Executive Order 13,526 Section 1.6.  *In camera* inspection for these records may be in order to determine if they are properly classified under the executive order. CIA's declarant Shiner does not have personal knowledge of the classification of these records when they were created.

As noted, on October 26, 2017 President Trump issued this official statement instructing release of records related to the assassination of President Kennedy:

Today, President Donald J. Trump took action to ensure release of the remaining President John F. Kennedy Assassination Records. Accordingly, the National Archives and Records Administration will make approximately 2,800

records available in full for public access today. The remaining records will be released with agency-proposed redactions on a rolling basis in the coming weeks. The President has demanded unprecedented transparency from the agencies and **directed them to minimize redactions without delay.** The National Archives will therefore release more records, **with redactions only in the rarest of circumstances,** by the deadline of April 26, 2018. (**emphasis added**). The White House Office of the Press Secretary, For Immediate Release, October 26, 2017.

The statement instructs that aged records related to the assassination of President Kennedy such as the ones at issue in this case be released forthwith with minimal redactions.

## V.  CIA's EXEMPTION 3 CLAIMS FAIL.

The CIA invoked the two Exemption 3 statutes discussed below.

A. *The CIA Act* Exemption 3 Statute 50 U.S.C. §3507

The CIA relied on the *Central Intelligence Agency Act of 1949* ("CIA Act"), 50 U.S.C. §3507, as amended.  It exempts the Agency from publishing or disclosing "the organization, names, official titles, salaries, or numbers of personnel employed by the [CIA]."  50 U.S.C. §3507.

In *Phillippi* v. *CIA*  ("*Phillippi*"), 546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976), the D.C. Circuit cautioned that the CIA Act does not permit the agency 'to refuse to provide any information at all about anything it does.' Similarly, in *Baker* v. *CIA*, 580 F.2d 664, 669 (D.C.Cir. 1978), the court held that the CIA Act applies to "personnel information[.] Despite these admonitions, the agency has recently asserted the CIA Act in a bevy of

cases … to exclude information regarding the organization and functions of the agency generally, on the theory that the CIA only functions through the acts of its employees." *Sack* v. *CIA*, 49 F. Supp. 3d 15, 22 (D.D.C. 2014) (citations omitted).  *Sack* ruled that "[t]he phrase 'of personnel employed by the Agency' applies to each item in the list 'organization, functions, names, official titles, salaries, or numbers' and thus the CIA Act only applies to personnel information." *Id*. at 22 (emphasis added).

   The CIA's declarant, Antoinette B. Shiner ("Shiner")  does not state that the records she addresses are personnel documents, and a review of the records indicates that they are not.  Rather, Entry 1 is the *Propagandists Guide* document that appears to be part of CIA's intelligence function.  Entries 2-6 are the results of searches for records responsive to AARC's request rather than personnel data.  There is no reason stated for maintaining the identity of these CIA personnel as covert.  Given the multiple reversals and errors in the conduct of the search, it is important to the Court and counsel to know the names of those involved for purposes of discovery about the irregularities apparent in the search.  Any privacy interest must give way to the Court's need for the information to make a decision on the issues before it.

 B. *National Security Act of 1947* ("NSA Act") 50 U.S.C. §3024

      The NSA Act protects against the unauthorized disclosure of

intelligence sources and methods. But this Exemption 3 statute is subject to the same concern pointed out in *King, supra*. Is the source still alive? Has the source or method been disclosed? Is the source or method really unknown to foreign governments and the press? Are disclosures made by Congress considered "unauthorized"?

First, as argued above, Executive Order 13526, Section 3.3 authorizes disclosure of the material that is more than 50 years in age due to its automatic declassification provision. Exemption 3 only applies to unauthorized disclosure by its plain language. The material in the Propagandist's Guide is more than 50 years old and must be released. Second, large portions of the Propagandist's Guide have been released to plaintiff, which clearly disclose that the document is a guide to Propaganda strategies. This is the intelligence method that CIA seeks to keep secret by Exemption 3. CIA has already disclosed this intelligence method and therefore the remainder of the Propagandist's Guide must be released.

Third, as noted above, on October 26, 2017 President Trump ordered the timely release of aged records related to the assassination of President Kennedy such as those requested with minimal redactions.

## VI. CIA's EXEMPTION 5 CLAIM FAILS.

The documents withheld under Exemption 5 are the results of CIA's search for records responsive to AARC's FOIA request. They do not reflect a policy

deliberation within the agency, rather they are factually based records as to what was found or not found in the searches, which is the precise issue before the Court for decision.  Exemption 5 does not exempt such factual material from the disclosure requirements of the Freedom of Information Act.  *EPA* v. *Mink*, 410 U.S. 73,89 (1973).

Given the multiple reversals and self-admitted errors in the search, these records are important factual material necessary to this Court's adjudication of the search issue. Nor are the records generated by attorneys or in the nature of legal advice related to AARC's request, rather they are factual materials as to search results.

The *Freedom of Information Act* explicitly empowers the district court to make a *de novo* review of the agency's handling of a FOIA request, and authorizes the court to review the content of all agency records, *in camera*, if necessary.  5 U.S.C. Section 552(a)(4)(B).

VII.  CIA's EXEMPTION 6 CLAIM FAILS.

Exemption 6 allows withholding of material where disclosure is a clearly unwarranted invasion of personal privacy.  The standard for withholding is higher than an unwarranted invasion of privacy, rather it must reach the more stringent clearly unwarranted standard.  In this case the information being withheld includes the names of CIA personnel who conducted the searches in dispute.  AARC has

recounted the multiple reversals by CIA during its administrative processing as to whether records existed, and its self-admitted error in issuing a no records response.  A further reversal was made after litigation was filed when CIA found 6 responsive records after repeated assertions that there were no records. AARC has requested discovery on these irregular actions, and the names of CIA personnel involved are necessary for that discovery.

Further, the public interests in this case outweigh the CIA's asserted privacy interest.  Our Court of Appeals has recently recognized the high public interest in the Kennedy assassination, stating, "(w)here that subject is the Kennedy assassination — an event with few rivals in national trauma and in the array of passionately held conflicting explanations — showing potential public value is relatively easy."  *Morley* v. *Central Intelligence Agency (2016 Morley),* 810 F.3d 841,844 (D.C.Cir. 2016).  As noted in this brief, the information requested relates to open questions of government agency performance arising from the assassination of a President of the United States.

The Congress unanimously passed *the President John F. Kennedy Records Collection Act of 1992* to cause prompt release of all records related to the assassination of President Kennedy.   The September 25, 1963 Joint Chiefs of Staff Top Secret Memorandum citied in this case was released as a result of the JFK Records Act.  AARC has pursued the new and startling information contained in

that memo to obtain additional records related to the CIA's detailed study of the plot to kill Hitler in Fall 1963.  And as previously noted, on October 26, 2017 President Trump ordered the release of records related to the assassination of President Kennedy with minimal redactions due to the strong public interest in these documents.  CIA's response as set forth above has been contradictory, subject to reversal and error.  CIA seeks to maintain secrecy of the searches conducted rather than allowing AARC and the Court to examine the searches.  In such circumstances, release of the names of CIA employees involved in the searches is warranted.

## VIII. THE CIA'S POSITION THAT THERE IS ONLY ONE DOCUMENT RELATING TO PLOTS AGAINST HITLER IS ILLOGICAL AND CONTRARY TO HISTORY.

The AARC's request seeks records on any and all records pertaining to Hitler over a period of several decades.  From the time of its creation in 1947, the CIA had an obligation to record and evaluate information about such plots.  The claim that it could not find any such records other than the *Propagandist Guide* document flies in the face of logic and reality.  Numerous scholarly works have attested to the existence of plots on Hitler other than the July 20 Hitler plot.  The claim that the CIA can find only one such document is not credible.

## CONCLUSION

In consideration of the foregoing, plaintiff AARC hereby moves the court for summary judgment that defendant CIA has not conducted an adequate search for records responsive to AARC's FOIA request, and that CIA be ordered to conduct an adequate search for responsive records, including operational files, and provide them to AARC.  Further, in light of the confusion evident in CIA's search for responsive records in this case AARC moves that the Court order that AARC be permitted to conduct discovery of CIA's search activities and location of responsive records that resulted in contradictory letters sent to AARC as to the existence of responsive records.  Further AARC prays the Court for an order compelling CIA to release to plaintiff the material withheld improperly under exemption claims as set forth above.

Respectfully submitted,

 __/s/  Daniel S. Alcorn_____
Daniel S. Alcorn
Counsel for Plaintiff
Assassination Archives
   and Research Center
D.C. Bar No. 383267
1335 Ballantrae Lane
McLean, VA  22101
Phone:  (703) 442-0704


James H. Lesar
Co-counsel for Assassination
 Archives and Research Center

D.C. Bar No. 114413
930 Wayne Avenue
Unit 1111
Silver Spring, MD 20910
Phone:  (301) 328-5920

November 13, 2017                    Attorneys for Plaintiff