# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |
|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, INC., |
| Plaintiff, |
| v. |
| CENTRAL INTELLIGENCE AGENCY, |
| Defendant. |

Case No. 1:17-cv-00160 (TNM)

## MEMORANDUM OPINION

The Assassination Archives and Research Center challenges the Central Intelligence Agency's response to its Freedom of Information Act (FOIA) request for all records related to the CIA's research into assassination attempts against Adolf Hitler, plus any records related to the resulting search itself. After a search effort, the CIA found only one non-search-related document, and concluded that any other pertinent documents had likely been given to the National Archives. I conclude that the CIA has met its burden of showing that the search was adequate and that its redactions were proper under FOIA. Accordingly, the CIA's Motion for Summary Judgment will be granted and Assassination Archives' Motion for Summary Judgment will be denied.

## I. BACKGROUND

Invoking FOIA and the President John F. Kennedy Assassination Records Collection Act of 1992 (JFK Records Act), 44 U.S.C. § 2107 note (1992), Assassination Archives seeks records pertaining to the CIA's research into plots to assassinate Adolf Hitler. Compl. ¶ 16. As part of its original FOIA request, the Assassination Archives attached a 1963 memorandum summarizing a Joint Chiefs of Staff briefing, which mentioned that "the plot to kill Hitler" was

"being studied in detail," as a historical parallel to the CIA's then-ongoing efforts to overthrow Fidel Castro. ECF 1-1 at 7. The first request, sent in August 2012, asked for: (1) "all records on or pertaining to the CIA's 1963 study of plots to assassinate Adolf Hitler," and (2) "all records on or pertaining to communications by Allen Dulles regarding plots to assassinate Adol[f] Hitler" during Dulles's relevant periods of service in the Office of Strategic Services (a precursor to the CIA), or the CIA itself. Compl. Ex. 1, ECF No. 1-1. After the CIA said that no responsive records could be found, Assassination Archives sent an amended request in October 2012. Compl. ¶ 16. That request sought:

> (1) All records on or pertaining to any plot to assassinate Adolf Hitler, including, but not limited to, all records in any way reflecting or referencing the CIA's study in 1963 of plots to assassinate Hitler. . . .
>
> (2) All records on or pertaining to communications by or with Allen Dulles regarding plots to assassinate Adol[f] Hitler during Dulles's service in the Office of Policy Coordination (OPC), the Office of Strategic Services (OSS), and the Central Intelligence Agency (CIA).
>
> (3) All index entries or other records reflecting the search for records responsive to this request in its original or amended form, including search times used with each of the components searched.

Compl. Ex. 2. Assassination Archives again told the CIA, on June 5, 2015, that a search had revealed no responsive records. Compl. ¶ 18. But in November 2015, Assassination Archives received a third response from the CIA stating that the letter was "sent . . . in error" and that the FOIA request was still under review. *Id*.

After consulting with historical staff about where potentially responsive records might be found, the CIA's search eventually led to one responsive record: a 69-page Propagandist's Guide to Communist Dissensions from 1964 (Propagandist's Guide). Pl.'s Mem. In Support of Pl.'s Mot. Summ. J. (Pl.'s Mot. Summ. J.) 8. The CIA produced a redacted version of the

2

Propogandist's Guide, and redacted versions of five internal communications related to the FOIA search itself. *Id*. Both parties now seeks summary judgment, urging opposite conclusions as to the adequacy of the CIA's search, and the legality of its redactions.

## II. LEGAL STANDARDS

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). FOIA requires federal agencies to "disclose information to the public upon reasonable request unless the records at issue fall within specifically delineated exemptions." *Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 365-66 (D.C. Cir. 2008). Thus, a FOIA defendant is entitled to summary judgment if it shows that there is no genuine dispute about whether "each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements." *See Weisberg v. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980). Courts decide the "vast majority" of FOIA cases on motions for summary judgment. *See Brayton v. Office of United States Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).

To show that any unproduced documents are unidentifiable, a defendant must show "a good faith effort to [] search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). In other words, the defendant must "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Nation Magazine v. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). The touchstone of the analysis is the reasonableness of the search, not the records produced. *Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015). An agency may exercise discretion in crafting its search to meet this standard, and

3

does not have to search every system if additional searches are unlikely to produce any marginal return. *See Campbell v. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998). Searching for records requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," and is "hardly an area in which the courts should attempt to micro-manage the executive branch." *Schrecker v. Dep't of Justice*, 349 F.3d 657, 662 (D.C. Cir. 2003). To prove the reasonableness of its search, an agency can submit a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68. Agency declarations enjoy "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

To show that any unproduced documents are exempt from FOIA, an agency may file "affidavits describing the material withheld and the manner in which it falls within the exemption claimed." *King v. Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987). Courts review the applicability of FOIA exemptions *de novo* but give "substantial weight to detailed agency explanations" of national security concerns related to FOIA disclosures. *Id.*

### III. ANALYSIS

**A. The CIA Conducted an Adequate and Reasonable Search**

The CIA relies on declarations by Antoinette B. Shiner to establish the adequacy of its search. *See* Third Supp. Decl. of Antoinette B. Shiner at 2-4, ECF No. 25-1 (3d Supp. Shiner Decl.); Second Supp. Decl. of Antoinette B. Shiner (2d Supp. Shiner Decl.), ECF No. 19-2. Ms. Shiner describes the CIA's exhaustive search in this manner:

> [I]nformation management professionals ("IMS") conducted searches of the Directorate of Analysis ("DA"); Directorate of

> Operations ("DO"), including its operational files; the Office of the Director, the Director's Action Center, the Office of the General Counsel, the Office of Congressional Affairs, the Center for the Study of Intelligence (which is part of the CIA's Talent Center) and the CIA's history staff office. These directorates and offices were selected on the basis that they would potentially contain the historical studies and the documentary materials sought by Plaintiffs. For each of these offices, IMS personnel identified the specific database and files that would potentially contain the types of records responsive to Plaintiffs' request—i.e., the searches included all relevant office databases, Agency share drives, and archival records-for memoranda, correspondence and any other records responsive to the request at issue. Keyword searches . . . were targeted to retrieve records from each database and set of files that contained those terms. In cases where records provided references to additional responsive documents, IMS professionals followed up on those leads and conducted additional searches based on those terms or references. No other offices were deemed likely to maintain responsive documents.
>
> . . . Moreover, Agency personnel consulted with the CIA's history staff, who are very knowledgeable about the Agency's holdings with respect to the request's subject matter. In fact, the Agency's Chief Historian was personally consulted. He advised on Agency-wide searches and personally conducted searches of history staff files for any reference to studies of anti-Hitler plots dating from the 1963 time frame, as referenced very briefly in the "JCS Memo" or "Higgins Memorandum," attached to Plaintiffs' complaint and opposition. The Chief Historian did not locate any additional responsive records (apart from the one document that had already been released to Plaintiffs) and opined that, due to the age of the subject matter and narrow scope of Plaintiffs' request focusing on anti-Hitler plots, there would not be many responsive documents and anything related to assassination studies would likely be found at the National Archives. Indeed, IMS professionals noted that these types of records have likely been accessioned to the National Archives and Records Administration.

3d Supp. Shiner Decl. at 2-4.

Assassination Archives argues that the CIA did not conduct an adequate search because the CIA should have found records that are connected to "known operations, events and activities." AARC's Cross-Mot. 18. Since no records of a Hitler study have been found,

5

Assassination Archives contends that the CIA's search efforts must have been inadequate. But "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). And mere speculation that efforts are insufficient—without any meaningful indication of what else the CIA should have done[1]—fails to rebut the presumption of good faith accorded to agency declarations. *SafeCard Servs. Inc.*, 926 F.2d at 1201. This is especially so when the documents sought are likely quite old and the CIA's Chief Historian indicates they would have been handed over to the National Archives. 3d Supp. Shiner Decl. at 4. This explanation is entirely plausible on its face.

Next, Assassination Archives alleges that the CIA's no-records letters qualify as "troubling questions as to the conduct of the search." Pl.'s Mot. Summ. J. 19-20. But the CIA admitted that the two letters were sent by administrative error, CIA Reply 12, and the Plaintiff argues that the errors raise "troubling questions" without even mentioning what those questions might be. Pl.'s Mot. Summ. J. 20. The Plaintiff also contends that the CIA's Chief Historian should have himself submitted an affidavit, an "omission" that warrants a deposition by the Assassination Archives. Pl.'s Reply 4. But it is not the duty of this Court to "micro-manage"

---

[1] Assassination Archives suggested additional search terms in its opening brief, and was not satisfied when the agency gave detailed examples of the search terms it had used. 3d. Supp. Shiner Decl. at 4-5; Pl.'s Reply 7-8. But the CIA's search terms are quite exhaustive, including searches of many significant phrases (including "Hitler Assassination," "1963 assassination study," and "Dulles files"), as well as those same words individually searched without quotes (plot, Hitler, assassination, Dulles), a method calculated to "ensur[e] the broadest array of responsive hits." 3d. Supp. Shiner Decl. at 4-5. The Plaintiff's suggestion that the CIA was delinquent in failing to search phrases like "July 20 plot" and "plot to kill Hitler" ignores the fact that those phrases would duplicate searches the CIA had already performed for "plot" and "Hitler." *See* Pl.'s Reply 7-8. And the remaining suggestions—such as "Joint Chiefs meeting September 25, 1963," and "Castro overthrow," Pl.'s Reply 7—stray far afield, and into micro-management of agency efforts.

search efforts (or litigation strategy), particularly when an agency has met its burden of demonstrating a systematic good faith search effort. *Schrecker*, 349 F.3d at 662. No statutory provision or court precedent requires affidavits from all government employees involved in the search or dictates who among them should be the affiant. I conclude that the presumption of agency good faith stands unrebutted, *see SafeCard Servs. Inc.*, 926 F.2d at 1201, and that the CIA has established the adequacy of its search beyond any genuine dispute.

### B. The CIA Properly Applied FOIA Exemption 1

Exemption 1 applies when criteria laid out in an Executive order authorizes information to be kept secret in the interest of national security, and the information is in fact properly classified pursuant to such order. 5 U.S.C. § 552(b)(1); *Military Audit Project v. Casey*, 656 F.2d 724, 737 (D.C. Cir. 1981). The CIA utilized Exemption 1 to redact parts of the Propagandist's Guide containing information related to intelligence methods still in use, pursuant to Section 1.4(c) of Executive Order 13526. 2d Supp. Shiner Decl. at ¶¶ 9-11. Executive Order 13526 authorizes original classification authorities to classify information that "could reasonably be expected to cause identifiable or describable damage to the national security." 75 Fed. Reg. 707, 709 (Dec. 29, 2009). Moreover, the classified information must "pertain[] to" one or more items on an enumerated list, including "intelligence activities (including covert action), intelligence sources or methods, or cryptology." *Id.* at 709.

Assassination Archives contends that because the Propagandist's Guide is more than 50 years old, the redacted information has been automatically declassified under Executive Order 13526. Pl.'s Mot. Summ. J. 26-27. But the Order's 50-year declassification provision only provides for automatic declassification "not later than 3 years from the effective date" of December 29, 2009, if the relevant agency head has not, "[i]n extraordinary cases . . . within 5

7

years of the onset of automatic declassification, propose[d] to exempt additional specific information from declassification." *See* Executive Order 13526, Section 3.3(h)(2). Here, that exact procedure has occurred. The CIA issued a CIA Declassification Guide on September 26, 2012 (less than three years after the relevant Executive Order), with an exemption for "sensitive information that could reveal an intelligence method in active use." 2d Supp. Shiner Decl. at 5-6. This Guide was issued under the authority of Director of the CIA, and approved by the Interagency Security Classification Appeals Panel, as required by Executive Order 13526, Section 3.3(j). *Id*. at 6 n. 1. Assassination Archives also alleges that the information should not be classified because the title "Propagandist's Guide" gives away the details of the redacted information. Pl.'s Mot. Summ. J. 25, 31. But a mere title does not provide any insight into the CIA's specific methods. On this record, I find that the information that the CIA redacted from the Guide—namely, information that might reveal an intelligence method still in active use—remains properly classified under Exemption 1, and beyond the reach of FOIA.

**C. The CIA Properly Applied FOIA Exemption 3**

Exemption 3 applies to matters that are "specifically exempted from disclosure by [another] statute" if that statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Section 6 of the Central Intelligence Agency Act (CIA Act) requires that the CIA protect from disclosure "the . . . names, official titles . . . or numbers of personnel employed by the [CIA.]" 50 U.S.C. § 3507. The National Security Act requires the Director of National Intelligence to "protect intelligence

sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).[2] The CIA invoked the National Security Act as independent authority for redacting intelligence methods from the Propagandist's Guide, and invoked the CIA Act to withhold the names and phone numbers of the CIA employees that conducted the search. 2d Supp. Shiner Decl. at 7-8.

Assassination Archives argues that the CIA should not have withheld employee names, because the need to get to the bottom of the mistakes made during the FOIA search outweigh any relevant privacy interests. Pl.'s Mot. Summ. J. 29. But Exemption 3 is not a balancing test. Instead, "the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Morley*, 508 F.3d at 1126. As mandated by statute, the CIA properly used Exemption 3 to withhold the names and phone numbers of the CIA employees who conducted the requested search. 2d Supp. Shiner Decl. 8; 50 U.S.C. § 3507.

Moreover, Assassination Archives challenges application of Exemption 3 to the Propagandist's Guide, because large portions of the guide are public and it is over 50 years old. Pl.'s Mot. Summ. J. 28-29. But again, this claim is irrelevant to the legal issue. Even though large portions of the guide are public, the CIA withheld specific information in order to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). Nothing the Plaintiffs have argued undermines this material fact. Thus, the CIA properly applied Exemption 3.

---

[2] Agencies other than the National Security Agency may invoke this provision as grounds for withholding information under Exemption 3. *See Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (accepting CIA invocation).

9

### D.  The CIA Properly Applied FOIA Exemption 5

The CIA also redacted parts of internal communications regarding the FOIA search pursuant to FOIA Exemption 5 and the deliberative process privilege.  Exemption 5 protects from disclosure "inter-agency and intra-agency memorandums or letters which would not be available by law."  U.S.C. § 552(b)(5).  In other words, it covers records that would "normally [be] privileged in the civil discovery context," *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975), including the Executive Branch's deliberative process privilege.  *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).  This privilege applies when the relevant document is predecisional and deliberative, *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991), because otherwise disclosure would undermine performance by discouraging candid discussion.  *See Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987).  The privilege also applies when material is "inextricably intertwined" with deliberative material.  *See FPL Group, Inc. v. IRS*, 698 F.2d 66, 81 (D.D.C. 2010).

The CIA contends that it properly withheld communications between CIA staff that would reveal how internal search methods were decided upon and conducted, as well as materials inextricably intertwined with these communications.  2d. Supp. Shiner Decl. 8-9.  Assassination Archives makes the bald assertion, without a citation to the record, that the CIA's redactions "do not reflect a policy deliberation . . . rather they are factually based records as to what was found or not found."  Pl.'s Mot. Summ. J. 31.  This unsupported claim fails to rebut the presumption of good faith that I must give to agency affidavits.  *SafeCard Servs. Inc.*, 926 F.2d at 1201.  I conclude that the CIA properly applied Exemption 5.

## E. The CIA Properly Applied FOIA Exemption 6

An agency may use Exemption 6 to protect "personnel and medical files" and files that would constitute a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). If a privacy interest exists, the third party's privacy interest is weighed against the public interest in disclosure. *See ACLU v. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011). The CIA invokes this exemption as an independent basis for withholding the names and phone numbers of agency personnel. 3d Supp. Shiner Decl. at 8-9.

Assassination Archives alleges that Exemption 6 does not apply because disclosure of CIA personnel names and telephone numbers are important for sniffing out why administrative errors occurred in this case, and to vindicate the public interest in the John F. Kennedy assassination. Pl.'s Mot. Summ. J. 31-33. But the connection between these records and President Kennedy's assassination are tenuous at best, resting on the Plaintiff's theory that the Kennedy assassination was motivated by U.S. efforts to assassinate Fidel Castro, efforts that prompted the CIA to study assassination attempts on Adolf Hitler. So this case is two assassinations removed from the assassination of President Kennedy. And even if I accepted the Plaintiff's proposition that public interest in the Kennedy assassination is relevant to this case, and relevant to the CIA's diligence during these search efforts, that interest does not outweigh the privacy interests of CIA personnel in their names and phone numbers. The public's interest in figuring out why two "no-records" emails were mistakenly sent is miniscule at best. And the fact that Congress has seen fit make the personal information of CIA staff members statutorily inaccessible also demonstrates the public's interest in CIA personnel avoiding personal scrutiny for their public service. *See* 50 U.S.C. § 3507. Accordingly, I conclude that the CIA properly applied Exemption 6.

**F. President Trump's Order Requires Nothing Further**

Assassination Archives also claims that the CIA's search efforts and redactions are inconsistent with President Trump's order regarding President Kennedy's assassination records, as recorded in a White House statement. That statement reads as follows:

> STATEMENT BY THE PRESS SECRETARY ON THE
> PRESIDENT JOHN F. KENNEDY ASSASSINATION
> RECORDS
>
> October 26, 2017
>
> . . .
>
> Today, President Donald J. Trump took action to ensure release of the remaining President John F. Kennedy Assassination Records. Accordingly, the National Archives and Records Administration will make approximately 2,800 records available in full for public access today. The remaining records will be released with agency-proposed redactions on a rolling basis in the coming weeks. The President has demanded unprecedented transparency from the agencies and directed them to minimize redactions without delay. The National Archives will therefore release more records, with redactions only in the rarest of circumstances, by the deadline of April 26, 2018.

2017 WL 4857002 (White House). The Plaintiff argues that this statement gives added "weight to the public interests at issue in this case," and contends that the CIA has failed to comply with President Trump's orders. Pl.'s Mot. Summ. J. 23, 27-28, 30, 33. But this argument fails to comprehend the limited scope of President Trump's order, and the CIA's support for its redactions in this case.

Put simply, President Trump ordered that President Kennedy's assassination records be released swiftly, "with redactions only in the rarest of circumstances." 2017 WL 4857002. As explained above, the records at issue in this case are only tenuously related to President Kennedy's assassination. *Supra* n. 11. President Kennedy's assassination records are held by National Archives, not by the CIA, and so the President's order does not even apply to this case. *See* 44

U.S.C. § 2107 note at Section 4(a)(1) (directing "the National Archives and Records Administration" to establish "a collection of records to be known as the President John F. Kennedy Assassination Records Collection."). Even on the generous assumption that CIA studies of Hitler assassination attempts are part of "the remaining President John F. Kennedy Assassination Records" referenced by the White House statement, the order only requires agencies to "minimize redactions without delay." 2017 WL 4857002. For all of the reasons given above, I conclude that the CIA conducted a legally adequate search, and has minimized redactions under applicable law.

## IV. CONCLUSION

For the foregoing reasons, the CIA's Motion for Summary Judgment will be granted and the Plaintiff's Motion for Summary Judgment will be denied. A separate order will issue.

Dated: July 17, 2018

TREVOR N. MCFADDEN
United States District Judge